LYNN A. CERVERO *v.* MORY'S ASSOCIATION, INC., ET AL.
(AC 31110)

Gruendel, Alvord and Pellegrino, Js.

Argued March 22—officially released June 22, 2010

*John A. Keyes,* for the appellant (plaintiff).

*Donald F. Babiyan,* for the appellees (defendants).

*Opinion*

PELLEGRINO, J. The plaintiff, Lynn A. Cervero, appeals from the decision of the workers' compensation review board (board) affirming the decision of the workers' compensation commissioner (commissioner) denying her request that her employer pay for two level disc surgery for her compensable injury. On appeal, the plaintiff claims that the board improperly sustained the commissioner's finding that her surgery was not medically reasonable or necessary pursuant to General Statutes § 31-294d. We affirm the decision of the board.

The following factual and procedural history is necessary for our discussion. The plaintiff was injured on June 6, 2002, while employed by the defendant Mory's Association, Inc.,[1] as a " 'waitress-bartender.' " The plaintiff injured her lower back while " 'carrying heavy trays from the basement . . . to the first floor' " of the defendant's New Haven restaurant. A voluntary agreement, under which the defendant accepted that the injury was compensable, was approved by Commissioner George A. Waldron on October 2, 2002.

Following her injury in 2002, the plaintiff went to her primary care physician, who referred her to Michael Connair, an orthopedic surgeon. Connair prescribed conservative treatment, including " 'lamp therapy,' " a " 'Medrol dose pack,' " prescription medications and

---

[1] Travelers Property & Casualty Company also was named as a defendant. For convenience, we refer in this opinion to Mory's Association, Inc., as the defendant.

physical therapy. On June 18, 2002, Connair diagnosed the plaintiff with " 'multi-level degenerative dis[c] disease with spur formation at L4-5, L2-3 and L1-2 and T12-L1.' " On September 24, 2002, after a magnetic resonance imaging (MRI) scan, Connair determined that the plaintiff's condition was " 'not severe enough to warrant surgical intervention at this time.' "

In October, 2002, Connair referred the plaintiff to Josef K. Wang, a physician, for a pain management evaluation. Wang suggested " 'lumbar epidural steroid injections to control [the plaintiff's] pain' " and administered two such injections. The defendant asked the plaintiff to be evaluated by its expert witness, John J. Shine, an orthopedic surgeon, on November 14, 2002. Shine's review of the July, 2002, MRI reports indicated that the plaintiff had " 'severe dis[c] degeneration at L4-5 with some slight narrowing of the foramen on the left side but no canal stenosis.' " The report further showed " 'minimal disc bulging at L5-S1.' " Shine recommended pool therapy and " 'use of a lumbar support brace.' "

In May, 2003, the plaintiff sought a second opinion from another orthopedic surgeon, Kenneth M. Kramer. The plaintiff testified that Kramer provided " 'traction therapy' " and " 'facet' injections." Kramer agreed with Connair that the plaintiff had a light duty work capacity and should be treated conservatively. He suggested a follow-up MRI scan to ascertain if the plaintiff would be an appropriate candidate for a " 'lumbar decompression at L4-5.' " In August, 2003, Kramer determined that the plaintiff was not " 'surgical under the circumstances' " and recommended that she return to physical therapy.

In January, 2004, the defendant had the plaintiff examined by another expert witness, Robert N. Margolis, an orthopedic surgeon. Margolis diagnosed the

plaintiff with " '[l]umbar strain syndrome' " and " '[m]arked degenerative motion segment disease at L4-5.' " Margolis noted that " 'virtually no form of treatment helps her.' " Margolis concurred with Kramer and Connair that the plaintiff had a light duty work capacity. He determined that she had reached maximum medical improvement and assigned a 12 percent permanent impairment to her lumbar spine. Margolis further concluded that " '[t]here [was] absolutely no question in [his] mind that she is not a surgical candidate for any type of procedure.' "

In February, 2004, Kramer opined that the plaintiff's condition had " 'partly improved.' " He determined that no additional formal treatment measures were " 'indicated or anticipated' " and determined that the plaintiff had reached maximum medical improvement with an 8 percent permanent partial impairment rating and a permanent sedentary work restriction.

Nonetheless, because her " 'back pain was getting worse,' " the plaintiff began treatment with Steven P. Novella, a neurologist. The plaintiff paid for Novella's treatment through her private insurance. The plaintiff testified that Novella placed her on " 'a lot of medications' " and put her back on " 'traction therapy.' " The plaintiff returned to work in September, 2004, at Seaside Mattress, where she worked up to four hours a day handling telephone duties. She continued to work there until June or July, 2005, when she left because she could not commit to working every day and had to leave work sporadically due to her back pain.

The plaintiff thereafter met with John G. Strugar, a neurosurgeon, for consultation and advice. Strugar opined that he " '[could not] clearly recommend surgery for this patient at this point.' " He suggested that " 'there is an indication here for dis[c] replacement at the L4-5, even at L2-3. However, that would be quite difficult

to do at that level.' " He recommended a more conservative course of treatment, including an aqua therapy program. He further suggested that the plaintiff should consult James J. Yue, a neurosurgeon, regarding disc replacement.

Yue examined the plaintiff on October 17, 2005. He evaluated her MRI scans from April, 2005, and diagnosed " 'L4-L5 discogenic changes with a central dis[c] bulge, some mild L5-S1 discogenic changes and a normal appearing L4-L5 level.' " He recommended a discogram that revealed " '[m]ultilevel degenerative dis[c] and facet degenerative changes' " and a " 'small endplate cyst on the superior aspect of L5.' " Yue directed the plaintiff to return to Wang for additional pain management treatment. The plaintiff testified that Wang has had her take Percocet for two years as of the date of the formal hearing. Yue recommended surgery for the plaintiff.

On February 2, 2006, Yue stated that " '[t]he patient desires to proceed with surgical correction of her issues.' " He recommended a " 'L4-L5 and L5-S1 dis[c] replacement' " but also suggested that a cyst might make replacement of L4-5 impossible. On February 15, 2007, Yue opined that a " 'two level lumbar dis[c] replacement would give [the plaintiff] the ability to perform clerical and light-to-moderate duty work in the future.' " At his deposition, Yue outlined his rationale for performing disc replacement surgery, stating that " 'if we can remove that pain generator, there's a chance we may alleviate some of her pain. She'll never have a pain free back; it's not something that I . . . think she will ever achieve because of her other levels of degeneration above, but . . . [if] . . . the replacement functions properly . . . she can expect about 70 to 75 percent relief of her pain . . . .' "

Yue also testified that although the plaintiff's bone density and her cyst might make a fusion the only feasible intervention, he preferred disc replacement. He cited three reasons, including that it tended to " 'protect the other levels above or below it from future degeneration at least on a rapid scale.' " He testified that he had performed between " '500 or 600' " disc replacement surgeries and that although there are significant differences of opinion in the medical community on the effectiveness of disc replacements, he believed that they were statistically superior to fusions. He also testified that although a successful fusion surgery would produce the same chance of relief of symptoms as a disc replacement, a disc replacement would expedite the plaintiff's return to work, which would be delayed six months with a fusion.

It was the plaintiff's position that her condition was getting worse, that her pain was an impediment to her performing daily activities and that she was interested in having the disc replacement surgery. She testified that she could not sit without pain and that she could stand only for fifteen or twenty minutes without pain.

Following an informal hearing, Commissioner Rhoda Loeb directed that the plaintiff should be examined by a commissioner's examiner. William H. Druckemiller, a neurosurgeon, conducted that examination on November 8, 2006. Druckemiller diagnosed the plaintiff with " 'significant degenerative changes at the L4-5 level with a traction spur anteriorly and a suggestion of an early degenerative spondylolisthesis' " as well as " 'moderate degenerative changes at L2-3.' " Druckemiller did not agree with Yue's recommendation that the plaintiff should undergo disc replacement surgery. On December 22, 2006, he stated that " '[the plaintiff] is unlikely to get a good, long term result from surgery and that should be avoided at this point in time.' " On December 12, 2007, he stated, after examining bone

scan and MRI scan results, that " '[t]hese reports if anything confirm my previous opinion that surgery is not a good option for this patient.' " He explained his reasoning by stating that " 'the patient [was] not a good surgical candidate and [that he] personally would not perform that surgery . . . [because] she has significant, multiple level disease other than the areas noted to be positive on the [MRI] scan and the previous discogram.' " According to Druckemiller, " '[i]f [the plaintiff] has a two level fusion, she is highly likely to have significant pain early on from an adjacent level syndrome at L3-4 and L2 is already known to be positive on a bone scan.' "

At a deposition on April 25, 2007, Druckemiller testified that although single level disc replacement generally has an 80 percent rate of success in improving the patient's symptoms and that two level disc replacement has a 70 percent rate of success, he did not think surgery would provide the plaintiff with a dramatic difference in the level of pain she was experiencing. Because Druckemiller did not think that the surgery would benefit the plaintiff significantly, he instead suggested that she might benefit from " 'a good back strengthening exercise program.' "

On the basis of this evidence, the commissioner concluded that the plaintiff was credible and that she was suffering a compensable injury—multilevel degenerative disc disease. He found that Yue had proposed performing either a multilevel or single level disc replacement for the plaintiff, and that Yue had opined that this procedure provided the plaintiff with the best opportunity to return to the workforce. The commissioner also noted that two of the plaintiff's physicians, Connair and Kramer, recommended conservative treatment, as did the defendant's experts. In reviewing the testimony of Druckemiller, the commissioner concluded that it was Druckemiller's opinion that disc

replacement surgery would not be reasonable or necessary medical treatment.

The commissioner found Druckemiller to be " 'fully credible and persuasive,' " and did not find Yue " 'fully credible and persuasive.' " Thus, he concurred with Druckemiller's view that disc replacement surgery would not yield a long-term benefit to the plaintiff and that it would result in medical problems to adjoining discs. The commissioner found that, at that time, neither two level nor single level disc replacement was " 'reasonable and necessary medical treatment,' " but suggested that if the plaintiff's condition continued to deteriorate, another commissioner and a different physician should reevaluate the merits of surgery.

Thereafter, the board affirmed the finding of the commissioner. The board's opinion stated that it was apparent that Druckemiller and Yue utilized different standards for evaluating the efficacy of the proposed surgery and deferred to the commissioner's decision to give greater weight to the opinion of the commissioner's examiner, Druckemiller. The board asserted that although a commissioner may choose to approve treatments that have a relatively low percentage of success, that does not establish that, once a minimum threshold is met, the commissioner is obligated to approve surgery. This appeal followed. Additional facts and procedural history will be provided as necessary.

On appeal, the plaintiff claims that the board improperly sustained the commissioner's finding that her two level disc surgery was not medically reasonable or necessary. The plaintiff also argues that the commissioner failed to apply the proper standard of law to the facts of her case and improperly denied payment of her surgery. We disagree and affirm the decision of the board.

As a threshold matter, we set forth the standard of review applicable to workers' compensation appeals.

The principles that govern our standard of review in workers' compensation appeals are well established. "The conclusions drawn by [the commissioner] from the facts found must stand unless they result from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them. . . . Neither the . . . board nor this court has the power to retry facts. It is well established that [a]lthough not dispositive, we accord great weight to the construction given to the workers' compensation statutes by the commissioner and [the] board." (Citations omitted; internal quotation marks omitted.) *Tracy* v. *Scherwitzky Gutter Co.*, 279 Conn. 265, 272, 901 A.2d 1176 (2006). "The commissioner has the power and duty, as the trier of fact, to determine the facts." (Internal quotation marks omitted.) *Gartrell* v. *Dept. of Correction*, 259 Conn. 29, 36, 787 A.2d 541 (2002).

It is the exclusive function of the finder of fact to reject or to accept evidence and to believe or to disbelieve any expert testimony. The trier may accept or reject, in whole or in part, the testimony of an expert witness. *Tartaglino* v. *Dept. of Correction*, 55 Conn. App. 190, 195, 737 A.2d 993, cert. denied, 251 Conn. 929, 742 A.2d 364 (1999). "Because we are required to afford great deference to the commissioner's conclusion . . . we must interpret [the commissioner's finding] with the goal of sustaining that conclusion in light of all of the other supporting evidence. . . . As we have made abundantly clear in the past, it would be improper for the board to disregard the commissioner's findings and substitute its preference regarding testimony." (Citation omitted; internal quotation marks omitted.) Id., 196.

Section 31-294d (a) (1) provides: "The employer, as soon as the employer has knowledge of an injury, shall provide a competent physician or surgeon to attend the injured employee and, in addition, shall furnish any medical and surgical aid or hospital

and nursing service, including medical rehabilitation services and prescription drugs, as the physician or surgeon deems *reasonable or necessary*. The employer, any insurer acting on behalf of the employer, or any other entity acting on behalf of the employer or insurer shall be responsible for paying the cost of such prescription drugs directly to the provider." (Emphasis added.)

Essentially, the plaintiff claims that Yue's recommendation was sufficient to require a finding that the plaintiff's surgery was medically reasonable or necessary. Nonetheless, the plaintiff fails to acknowledge that the record contains the opinions of numerous physicians who had determined that she was not a good candidate for surgery. Wang suggested lumbar epidural steroid injections. Shine recommended pool therapy and a lumbar support brace. Connair prescribed conservative treatment and determined that the plaintiff's condition was " 'not severe enough to warrant surgical intervention.' " The plaintiff sought a second opinion from another orthopedist, Kramer, who agreed with Connair's assessment that the plaintiff's condition should be treated conservatively and that she was not a surgical candidate under the circumstances.

The plaintiff visited another orthopedic surgeon, Margolis, who noted that " 'virtually no form of treatment helps her' " and concluded that " 'there is absolutely no question in [his] mind that she is not a surgical candidate for any type of procedure.' " Novella put her back on medication and traction therapy. The plaintiff was then examined by Strugar, who stated that he " '[could not] clearly recommend surgery for this patient at this point,' " and indicated that the plaintiff's requested surgery would be quite difficult. It was not until the plaintiff visited Yue, in 2005, that she found a physician who recommended surgery. After Yue's recommendation, the commissioner directed that the plaintiff be examined by the commissioner's examiner,

Druckemiller, who agreed with the previously expressed and consistent opinion of the other physicians that the plaintiff was not a good candidate for surgery. Druckemiller testified that he did not think surgery was going to work and that the plaintiff might benefit from " 'a good back strengthening exercise program.' "

The plaintiff cites *Cirrito* v. *Resource Group Ltd. of Connecticut*, No. 4248 CRB-1-00-6 (June 19, 2001), as establishing that if a treatment might help a claimant or is " 'worthy of attempt,' " then the commissioner is obligated to find that the treatment is medically reasonable or necessary.[2] The plaintiff argues that the commissioner improperly failed to apply this standard in finding the testimony of Druckemiller to be credible and persuasive. On appeal, the board agreed with the commissioner's interpretation, finding that *Cirrito* stands for the proposition that although the commissioner has discretion to approve a treatment with a low chance of success, he is not required to approve it simply because a claimant has found a physician who suggests that the particular treatment would be " 'worthy of attempt.' " The board's written opinion provides a careful and precise analysis of the *Cirrito* decision. "Whether a proposed course of treatment is reasonable or necessary is a factual issue to be decided by the trier based on the medical opinions in the record." *Irizarry* v. *Purolator Courier Corp.*, No. 4382 CRB-4-01-4 (May 2, 2002). The plaintiff frames the issue by contending that the commissioner improperly adopted Druckemiller's personal standard of " 'reasonable or necessary.' " We do not share this view.

_____

[2] The plaintiff attempts to define the "reasonable or necessary" threshold through the board's case law and law from other jurisdictions. In according great weight to the commissioner's and the board's construction of the workers' compensation statutes, we find that the commissioner's factual findings, based on the record, are consistent with the language of § 31-294d.

"[T]he power and duty to determine the facts rests on the commissioner, who is the trier of fact. . . . This authority to find the facts entitles the commissioner to determine the weight of the evidence presented and the credibility of the testimony offered by lay and expert witnesses. . . . Where the subordinate facts allow for diverse inferences, the commissioner's selection of the inference to be drawn must stand unless it is based on an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them. . . . Once the commissioner makes a factual finding, [we are] bound by that finding if there is evidence in the record to support it. . . . Our Supreme Court consistently has held that [n]o reviewing court can . . . set aside [an inference of the commissioner] because the opposite [inference] is thought to be more reasonable; nor can the opposite inference be substituted by the court because of a belief that the one chosen by the [commissioner] is factually questionable. . . . *This standard clearly applies to conflicting expert medical testimony. It [is] the province of the commissioner to accept the evidence which impress[es] him as being most credible and more weighty.*" (Citation omitted; emphasis in original; internal quotation marks omitted.) *Anderson* v. *R & K Spero Co.*, 107 Conn. App. 608, 616–17, 946 A.2d 273 (2008).

The board properly concluded that the commissioner's finding that surgery was not warranted was supported by sufficient evidence in the record. The commissioner based his decision on Druckemiller's determination, and he was able to draw from the opinions of Connair, Wang, Shine, Kramer, Margolis and Strugar. Restricted by our deferential standard of review, we conclude that the facts are consistent with the commissioner's finding and that the board properly sustained the commissioner's finding.

The decision of the workers' compensation review board is affirmed.

In this opinion the other judges concurred.